446 So.2d 403 (1984)
The IRWIN BROWN COMPANY
v.
MORTON'S AUCTION EXCHANGE, INC.
No. CA-1004.
Court of Appeal of Louisiana, Fourth Circuit.
February 9, 1984.
*405 Satterlee, Mestayer & Freeman, Henry F. Mestayer, New Orleans, for plaintiff-appellee.
Rudolph R. Schoemann, New Orleans, for defendant-appellant.
Before GULOTTA, GARRISON and LOBRANO, JJ.
GULOTTA, Judge.
Morton's Auction Exchange, Inc. (Morton's) appeals from a $4,140.27 judgment plus interest, costs and attorney's fees in favor of Irwin Brown Company (Irwin Brown) for freight forwarding services rendered on an open account. We affirm, except as to the attorney's fees award.
Irwin Brown, a freight forwarder and custom house broker for Morton's, a New Orleans antique dealer, filed suit on an open account for amounts pertaining to two invoices for services rendered in arranging the export of antiques from Morton's to an antique dealer in England and a separate import from England to New Orleans. Morton's reconvened, alleging that Irwin Brown's incorrect advice as a freight forwarder had caused Morton's to pay extra charges for the shipment to England and an earlier export to Venezuela.
After a trial on the merits, the trial court rendered judgment in favor of plaintiff for the balance due after applying certain credits in Morton's favor. The judgment further dismissed Morton's reconventional demands.
Appealing, Morton's contends the trial court erred in: 1) failing to find plaintiff's claim has prescribed; 2) dismissing Morton's reconventional demand based on plaintiff's negligent performance; and 3) awarding attorney's fees to plaintiff. Although we reject the first two contentions, we reverse and set aside the award of attorney's fees.

PRESCRIPTION
Relying on LSA-C.C. Arts. 3534 and 3536,[1] Morton's contends that Irwin Brown's suit is untimely because it is one for "vessel freight", which is subject to a one year prescriptive period. According to Morton's, plaintiff "stands in the shoes of the ocean carrier for whom it prepared the bill of lading for the freight and the delivery of merchandise shipped aboard the ocean carrier's vessel" and cannot assert a claim in open account to avail itself of the three year prescriptive period under LSA-C.C. Art. 3538. We disagree.
Irwin Brown arranged the shipping for Morton's, but did not transport or carry the goods shipped. Under these circumstances, plaintiff's claim is not for "vessel freight" or "delivery" but rather for services rendered as the freight forwarder. The one year prescriptive periods of LSA-C.C. Arts. 3534 and 3536 have no application to our case.
Both Morton's vice-president, David Goldberg, and plaintiff's export manager, Virginia West, testified that Irwin Brown had acted as a freight forwarder for Morton's for eight or nine years before the instant dispute. A ledger card recording Morton's account with Irwin Brown was introduced into evidence. This evidence establishes the existence of an open account, "... a situation where there have been running or current dealings between the parties and the account has been kept open with the expectation of further dealings." Colonial Products Co. v. Park Place Homes, Inc., 282 So.2d 574 (La.App. 4th Cir.1973). Indeed, Goldberg himself testified, "... we had an open account." *406 Accordingly, we conclude the trial court properly found plaintiff's claim to be in open account and, therefore, timely filed.

RECONVENTIONAL DEMAND
We likewise reject Morton's argument that the increased shipping costs resulted from plaintiff's fault or neglect. According to Morton's, Irwin Brown's misquotation of shipping rates, improper preparation of the bill of lading, and wrong choice of an ocean carrier caused defendant to incur unexpected shipping charges.
The evidence discloses that Morton's vice-president, David Goldberg, telephoned Irwin Brown to inquire about the rates for shipping a 20 ft. container of used household furniture from New Orleans to British Antique Exporters in Grennock, England. Irwin Brown's export manager, Virginia West, quoted Goldberg the applicable commercial rates based on volume and weight for such furniture. These rates also appear in a letter from Irwin Brown to Goldberg. Goldberg did not inform plaintiff that the shipment in fact contained antiques, which are shipped at a higher rate than used household furniture.
When Morton's could not pack all the items into the one container, Goldberg called Irwin Brown to inquire whether the excess cargo could be shipped in a separate 11 ft. crate, and was told by West that the same rates applied. Morton's also sent Irwin Brown a letter listing dimensions, weight and in toto values of the container and crate to be shipped to British Antiques Exporters. Irwin Brown did not have an itemized list of "circa values" indicating the age of the objects shipped, however.
Based on Goldberg's information, Irwin Brown subsequently prepared a bill of lading designating the shipment from "Morton's Auction Exchange" to "British Antique Exporters" and describing the cargo as "USED HOUSEHOLD FURNITURE SET UP". The agent for the steamship company carrying the goods, Atlanticargo, then rated the bill of lading according to established tariffs.
Morton's thereafter received a copy of the bill of lading listing freight charges in the amount of $3,317.00. This sum included a cost of $1,250.00 to ship the 20 ft. container and $2,067.00 to ship the smaller crate.
When Goldberg complained to Irwin Brown about this differential in rates, he was informed that a clerk at the shipping company had erroneously billed the shipment as a "personal" rather than a "commercial" one. Personal, non-commercial shipments are billed at cheaper rates for containerized cargo, but at higher rates for separate "break bulk" or non-containerized cargo (such as a smaller crate). Commercial shipments, on the other hand, are billed at a uniform rate whether or not containerized, though at a higher rate than personal shipments. Plaintiff's president, Sandra Brown, further informed Goldberg that the shipping company would issue a corrected statement at an increased charge for this commercial shipment.[2]
Goldberg thereupon told Brown that the shipment was a "personal" one that he was sending to himself. At Goldberg's request, Brown drafted a second bill of lading designating the cargo as "USED HOUSEHOLD PERSONAL EFFECTS NOT FOR RESALE". This revised document named "David Goldberg" as both the shipper and consignee, and "Norman Lefton", who was the owner of British Antique Exporters, as the party to be notified in England.
When the shipment reached England, however, it was inspected by "The Adherence Group", (TAG), a policing neutral body hired by steamship companies to handle cargo inspection. TAG had been alerted by an agent in its New Orleans office who was suspicious of the consignment by Morton's of "Used Household Furniture" *407 to British Antique Exporters. TAG discovered the shipment, in fact, contained antiques, and Morton's ultimately paid $10,126.03 in shipping charges at the higher rate applicable to antiques.
It is Morton's contention that Irwin Brown was negligent in failing to advise Morton's that the shipment could be checked by TAG, in failing to segregate the antiques from the non-antiques to avoid having the entire shipment go at the higher rate, and in improperly preparing bills of lading that obviously indicated on their face that an antique dealer was sending antiques to another dealer. Furthermore, according to Morton's, the cargo could have been shipped at a much reduced cost on another independent ocean carrier, the Bank Line, not policed by TAG. We disagree.
It is apparent from the testimony of Virginia West and Sandra Brown, plaintiff's employees, that the initial freight quotations and the preparation of the bills of lading were based upon the cargo description furnished by Morton's to Irwin Brown. The evidence supports conclusions that plaintiff did not know the shipment contained antiques, and that Irwin Brown correctly quoted rates to Morton's for a commercial shipment of household furniture. It was only after investigation of the shipment by TAG that the true nature of the shipment was ascertained and the higher shipping rate for antiques imposed. The increase in charges resulted not from any negligence or fault on the part Irwin Brown, but rather from Morton's failure to furnish complete information to its freight forwarder.
Morton's further contends that the increased shipping costs resulted from Irwin Brown's failure to use a "non-conference" shipping company charging lower rates and not subject to inspection by TAG.
Although Robert Cisco, a custom house broker, testified that the goods could have been shipped for about $1,600.00 from New Orleans to England on the non-conference "Bank Line", he had no documentation to indicate it was operating at the relevant time. Moreover, Donald Thomas of TAG testified that all non-conference carriers would have rates approximately the same as the Atlanticargo Service used by Irwin Brown. Based on credibility, the trial judge properly concluded that Morton's had suffered no loss attributable to Irwin Brown concerning the shipment to England.
Furthermore, evidence is lacking to support Morton's claim for loss in connection with the earlier shipment to Venezuela. Morton's asserted in its amended reconventional demand that it had been charged $11,114.65 to ship this cargo but had been quoted a price of only $1,600.52 by Irwin Brown.
According to Sandra Brown, plaintiff correctly quoted Morton's the shipping "rate" per unit to Venezuela, but never quoted a "total figure" for the cost of the actual shipment. Although the $1,600.52 figure would be correct for shipping only one container with less expensive contents, Morton's in fact shipped three containers of higher value to Venezuela, and was correctly billed $11,114.65, in accordance with the previously quoted rates. This testimony considered, we cannot say that the trial judge erred in dismissing defendant's reconventional demand for the "excess" charge on the Venezuelan shipment.

ATTORNEY'S FEES
The trial court's award of 25% attorney's fees to plaintiff was pursuant to LSA-R.S. 9:2781, which authorizes an award of reasonable attorney's fees for the prosecution and collection of a claim on open account. Morton's attacks Irwin Brown's entitlement to attorney's fees on two grounds: 1) that the claim asserted is one based on a contract of affreightment or carriage and not on open account; and 2) that plaintiff has failed to comply with LSA-R.S. 9:2781's requirement of a correct written demand setting forth the amount owed as a prerequisite to recovery of attorney's fees.
Because we have earlier concluded in this opinion that plaintiff's claim is on open account, we reject Morton's first contention on the attorney's fee question. We do find merit, however, to the argument that plaintiff *408 has failed to comply with the statutory requirements of LSA-R.S. 9:2781 for recovery of attorney's fees in an open account suit.
In order to recover attorney's fees under this statute, the claimant must furnish a "written demand ... correctly setting forth the amount owed and a copy of the invoices in support thereof...." Unless the amount demanded is correct, attorney's fees are not due. See A Better Place, Inc. v. Giani Investment Co., 445 So.2d 728 (La.1984); Ferd. Marks-Smither & Co. v. Homes Furnishing, 430 So.2d 239 (La.App. 4th Cir.1983); Fleet Tire Serv v. Schwegmann Bros., Etc., 408 So.2d 54 (La. App. 4th Cir.1981); and Scarborough v. Nelson, 371 So.2d 1261 (La.App. 3rd Cir. 1979).
Irwin Brown's demand letter to Morton's and the later petition were both for $6,323.88, the total of a $4,314.03 invoice (less a $945.73 credit invoice) and a $2,960.58 invoice. At trial, however, Irwin Brown's president, Sandra Brown, testified that the $2,960.58 invoice was subject to a $2,188.61 credit. Although the amount of the judgment indicates the trial judge properly included both credits in his calculation, the amount owed is not the same as the amount previously demanded. Under these circumstances, plaintiff cannot recover attorney's fees in accordance with LSA-R.S. 9:2781.
Finally, we reject Brown's claim that Morton's is now precluded from asserting the incorrectness of the demand since it failed to raise it during trial. The statutory entitlement to attorney's fees requires a written demand for payment for the correct amount. It is plaintiff's burden to establish entitlement to attorney's fees. It is not defendant's responsibility to point out how plaintiff failed to establish that claim. We cannot conclude that defendant's failure to raise this argument in the trial court prevents him from raising it in this court.
Plaintiff's reliance on LSA-C.C.P. Art. 1635[3] is misdirected. In this case, we are not concerned with an objection to the court's ruling or order as contemplated in the codal provision, but with an argument directed to the correctness of the trial court's judgment presently on appeal. Under these circumstances, we find no merit to plaintiff's argument.
Accordingly, the judgment of the trial court in favor of the Irwin Brown Company and against Morton's Auction Exchange, Inc. in the sum of $4,140.27 with interest from judicial demand and all costs, is affirmed. That portion of the judgment awarding attorney's fees of 25% of the principal amount of the judgment with interest is reversed and set aside. Costs of the appeal are to be divided equally between the parties.
AFFIRMED IN PART AND REVERSED IN PART.
NOTES
[1] LSA-C.C. Art. 3534 provides in part:

The following actions are prescribed by one year: ... That for the payment of the freight of ships and other vessels, the wages of the officers, sailors and others of the crew....
LSA-C.C. Art. 3536 provides in part:
The following actions are also prescribed by one year: ... That for the delivery of merchandise or other effects, shipped on board any kind of vessels....
[2] After the ship had departed from New Orleans, Strachan Shipping Company, the shipping agent, issued a correction notice charging $7,472.25 at the uniform commercial rate of $205.00 per cubic foot of cargo for the entire shipment. This revised rate was the same as that originally quoted by Irwin Brown to Morton's.
[3] LSA-C.C.P. Art. 1635 provides:

"Formal exceptions to rulings or orders of the court are unnecessary. For all purposes it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court and his grounds therefore; and, if a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection does not thereafter prejudice him."